UNITED STATES DISTRICT COURT9
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JAMES BLAZEK, ROBERT KENDRICK,
AOT TRANSPORTATION ARRIVE ON
TIME LLC, and ABSOLUTE 1 TRANSPORT LLC,

                *Plaintiffs*,

    -against-

MEDICAL ANSWERING SERVICES, LLC,

                *Defendant*.
------------------------------------------------------------X

                                   26 Civ. 00717 (AJB) (CBF)

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

JACOBS & ASSOCIATES
97 Newkirk Street
Suite 207
Jersey City, New Jersey 07306
Attorneys for Plaintiffs

**Table of Contents**

PRELIMINARY STATEMENT                                                                            1

STATEMENT OF FACTS                                                                              2

LEGAL STANDARD                                                                                  5

ARGUMENT                                                                                        7

I.   PLAINTIFFS HAVE PLAUSIBLY PLEADED THEIR FLSA CLAIM                                         7

    A.   Plaintiffs Plausibly Allege That MAS Was Their Employer                               8

    B.   Plaintiffs Plausibly Allege Minimum-Wage and Overtime Violations                     11

II.   PLAINTIFFS' STATE-LAW CLAIMS ARE PLAUSIBLY PLEADED                                       13

    A.   Count II: Plaintiffs Plausibly Plead Their NYLL Wage Claim                           13

    B.   Count III: Plaintiffs Plausibly Plead Breach of Contract                             15

    C.   Count IV: Plaintiffs Plausibly Plead Breach of the Implied Covenant of Good Faith and
       Fair Dealing                                                                        17

    D.   Count V: Plaintiffs Plausibly Plead Promissory Estoppel                              19

    E.   Count VI: Plaintiffs Plausibly Plead Tortious Interference with Business Relations /
       Prospective Economic Advantage                                                      21

III.   THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER
      THE STATE-LAW CLAIMS                                                              25

IV.   IN THE ALTERNATIVE, THE COURT HAS JURISDICTION UNDER CAFA                                28

V.   ANY DISMISSAL SHOULD BE WITH LEAVE TO AMEND                                               31

CONCLUSION                                                                                      32

**Table of Authorities**

Page(s)

Other Authorities

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
  98 N.Y.2d 144 (2002) ......................................................................................................17
*Abbott v. Comme Des Garcons, Ltd.*,
  84 F.4th 110 (2d Cir. 2023) ........................................................................................11, 12
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................................5
*Barfield v. N.Y.C. Health & Hosps. Corp.*,
  537 F.3d 132 (2d Cir. 2008) ..............................................................................................8
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................................5
*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
  373 F.3d 296 (2d Cir. 2004) ..............................................................................................6
*Brock v. Superior Care, Inc.*,
  840 F.2d 1054 (2d Cir. 1988) ........................................................................................8, 9
*Carnegie-Mellon Univ. v. Cohill*,
  484 U.S. 343 (1988)..........................................................................................................7
*Carter v. Dutchess Community College*,
  735 F.2d 8 (2d Cir. 1984) ..............................................................................................7, 8
*Carvel Corp. v. Noonan*,
  3 N.Y.3d 182 (2004)...................................................................................................22, 24
*Catzin v. Thank You & Good Luck Corp.*,
  899 F.3d 77 (2d Cir. 2018) ..............................................................................................27
*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ..............................................................................................6
*Couloute v. Ryncarz*,
  No. 11-CV-5986 (HB), 2012 WL 541089 (S.D.N.Y. Feb. 17, 2012) ......................................31
*Cyberchron Corp. v. Calldata Sys. Dev., Inc.*,
  47 F.3d 39 (2d Cir. 1995) ................................................................................................20
*Da Silva v. Kinsho Int'l Corp.*,
  229 F.3d 358 (2d Cir. 2000) ..............................................................................................6
*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (1995) ......................................................................................................17
*Dejesus v. HF Mgmt. Servs., LLC*,
  726 F.3d 85 (2d Cir. 2013) ..........................................................................................11, 12
*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
  631 F.3d 42 (2d Cir. 2011) ..............................................................................................15

*Erickson v. Pardus,*
    551 U.S. 89 (2007)..................................................................................................6

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
    545 U.S. 546 (2005)..............................................................................................28

*Godlewska v. HDA,*
    916 F. Supp. 2d 246 (E.D.N.Y. 2013) ..................................................................10

*Goel v. Bunge, Ltd.,*
    820 F.3d 554 (2d Cir. 2016) ..................................................................................6

*Gold v. N.Y. Life Ins. Co.,*
    730 F.3d 137 (2d Cir. 2013) ................................................................................30

*Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka,*
    134 F.4th 73 (2d Cir. 2025) ..................................................................................25

Harris v. Med. Transp. Mgmt., Inc.,  ,
    No. 17-cv-1371, 2025 U.S. Dist. LEXIS 206499, at *33-60 (D.D.C. Apr. 11, 2025) ..............10

*Hart v. Rick's Cabaret Int'l, Inc.,*
    967 F. Supp. 2d 901 (S.D.N.Y. 2013) ..................................................................15

*Irizarry v. Catsimatidis,*
    722 F.3d 99 (2d Cir. 2013) ..................................................................................15

*Kaye v. Grossman,*
    202 F.3d 611 (2d Cir. 2000) ................................................................................20

*Lundy v. Cath. Health Sys. of Long Island Inc.,*
    711 F.3d 106 (2d Cir. 2013) ............................................................................11, 12

*Lyndonville Sav. Bank & Tr. Co. v. Lussier,*
    211 F.3d 697 (2d Cir. 2000) ..................................................................................6

*Monahan v. N.Y.C. Dep't of Corr.,*
    214 F.3d 275 (2d Cir. 2000) ................................................................................31

*Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.,*
    723 F.3d 192 (2d Cir. 2013) ............................................................................11, 12

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.,*
    87 N.Y.2d 614 (1996)............................................................................................22

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,*
    309 A.D.2d 288 (1st Dep't 2003) ..........................................................................17

*Standard Fire Ins. Co. v. Knowles,*
    568 U.S. 588 (2013)..............................................................................................29

*Treglia v. Town of Manlius,*
    313 F.3d 713 (2d Cir. 2002) ................................................................................27

*United Mine Workers of Am. v. Gibbs,*
    383 U.S. 715 (1966)................................................................................................6

*United States v. Rosenwasser,*
    323 U.S. 360 (1945)................................................................................................8

*Williams v. Citigroup Inc.,*
    659 F.3d 208 (2d Cir. 2011) ................................................................................31

*Woodman v. WWOR-TV*, Inc.,
    411 F.3d 69 (2d Cir. 2005) ....................................................................................8

*Zheng v. Liberty Apparel Co.,*
    355 F.3d 61 (2d Cir. 2003) ..........................................................................7, 8, 9

**Statutes**

28 U.S.C. § 1332(d)................................................................................................28
28 U.S.C. § 1367 ..............................................................................................passim
29 U.S.C. § 207(a)(1) ..............................................................................................11
29 U.S.C. §§ 203(e)(1), 203(g)...................................................................................8
Social Services Law § 365-h(4)(b)...........................................................................10

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................................5, 6, 9
Fed. R. Civ. P. 15(a)(2) ...........................................................................................31
Fed. R. Civ. P. 8(d)(2)-(3) .......................................................................................20

**Regulations**

42 C.F.R. § 440.170................................................................................................10

Plaintiffs James Blazed and Robert Kendrick and their companies, AOT Transportation Arrive On Time LLC ("AOT") and Absolute 1 Transport LLC ("Absolute 1") (collectively as the "Plaintiffs") respectfully offer this Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Medical Answering Services, LLC ("MAS").

**PRELIMINARY STATEMENT**

MAS is New York's designated statewide broker for Medicaid non-emergency medical transportation ("NEMT"). Blazek and Kendrick are drivers who delivered that transportation through their companies. MAS controlled everything that mattered to their livelihoods, rider access, the mandatory platform, the trip assignments, the rates, and the performance metrics; and, then used metrics its own scheduling system inflated to terminate Plaintiffs on a single day's notice, deny Blazek and Kendrick the overtime they had earned, and hand their Medicaid riders to larger competitors.

MAS now asks this Court to bless all of it on a motion to dismiss by crediting MAS's version of the facts, draw every inference in its own favor, and decide the merits before a single document is produced. To get there, MAS slices one continuous course of conduct into tidy compartments: jurisdiction here, the FLSA there, the state-law claims somewhere else, and insists that each piece, viewed in isolation, fails. But a motion to dismiss tests the Complaint's allegations, not MAS's answer to them. Read as a whole, the Complaint tells a single story: the same platform, assignments, metrics, and terminations underlie every count.

Whether Plaintiffs ultimately prevail is a question for summary judgment or trial, not the pleadings. Accepted as true and read together, Plaintiffs' allegations plausibly state claims under the FLSA, the NYLL, and New York common law; the state-law claims share a common nucleus

1

of operative fact with the federal claim; and, in all events, the Complaint independently pleads jurisdiction under CAFA. The motion should be denied in its entirety.

## STATEMENT OF FACTS

The following facts are drawn from the Complaint and, on this motion, are assumed true. Defendant MAS operates New York's NEMT system as the statewide broker designated by the New York State Department of Health. MAS manages the provider network, receives rider requests, assigns trips, administers provider participation, monitors compliance, and controls providers' access to Medicaid riders. Complaint, ¶¶17-19. MAS acts as the gatekeeper between transportation providers and Medicaid riders, preventing providers from building an independent Medicaid-rider customer base outside MAS's system. *Id.* ¶¶19, 43. MAS also sets compensation rates without meaningful negotiation, requires providers to use its proprietary platform, and imposes strict pickup-time requirements. *Id.* ¶¶20-22.

Plaintiff James Blazek owns AOT and Plaintiff Kendrick owns Absolute 1. Compl. ¶¶ 12-15. AOT and Absolute 1 entered into materially identical Transportation Provider Network Contracts with MAS governing trip assignments, discipline, suspension, termination, corrective action, and appeals. *Id.* ¶¶ 26-28. Those contracts required MAS to assign only trips the provider's Transportation Provider Profile showed the provider could accommodate; allowed no-cause termination only on ninety days' written notice; required thirty days' notice and a ten-day cure period for material breach; permitted immediate termination only for defined defaults such as fraud, threats, or insurance lapses; allowed corrective action plans for performance issues; and required MAS representatives to meet with providers on appeal "with the intent of resolving the dispute." *Id.* ¶ 28(a)-(f).

Plaintiffs allege MAS disregarded those protections through its scheduling platform and metrics system. Compl. ¶¶ 31-38. MAS's platform allowed providers to block entire days but not discrete time windows, causing conflicts for small providers with multiple trips in a day. *Id.* ¶¶ 32-33. MAS assigned trips when providers were already committed to earlier rides or located in another county, creating overlapping or impossible schedules. *Id.* ¶¶ 33-35. Providers then had to reject unsafe or impossible trips or attempt them while risking traffic-law, safety, or pickup-time violations. *Id.* ¶ 34. When providers declined trips they could not realistically complete, MAS counted those refusals as negative "reassignment" or "refusal" events and inflated their performance rates. *Id.* ¶¶ 35, 37. Plaintiffs allege those metrics were unreliable because they resulted from MAS's own platform limitations, overbooking practices, and assignment decisions. *Id.* ¶ 38.

Plaintiffs further allege MAS's brokerage compensation structure gave it incentives to reduce transportation expenditures, favor larger transportation companies, and eliminate smaller providers unable to absorb impossible scheduling demands. Compl. ¶ 31. Blazek provided NEMT services through MAS's platform from approximately 2021 through March 2025, worked more than forty hours per week as his primary occupation, and was subject to MAS's control over rider access, trip assignments, platform use, timing requirements, and termination authority. *Id.* ¶¶ 40-43. MAS nevertheless classified him as an independent contractor and failed to pay overtime. *Id.* ¶ 44. Kendrick provided the same services under the same forms of control, also worked more than forty hours per week, and was likewise classified as an independent contractor without overtime pay. *Id.* ¶¶ 45-48.

Plaintiffs do not allege service-quality failures. To the contrary, they allege Blazek completed rides without quality complaints or discipline. Compl. ¶ 49. MAS assured Blazek,

3

through a field liaison named Arias, that reassignment rates were "not punitive," or words to that effect. *Id.* ¶50. Blazek relied on that assurance by continuing to operate in MAS's network and purchasing a second vehicle for approximately $30,000 to expand his NEMT business. *Id.* ¶ 51. MAS then used Blazek's inflated reassignment rate as the primary or exclusive basis for termination. *Id.* ¶ 52.

MAS terminated Kendrick and Absolute 1 from the provider network effective March 21, 2025, citing a high reassignment rate or similar metric-based rationale. Compl. ¶¶ 60-61. MAS terminated Blazek and AOT effective March 28, 2025—one day after notice—citing Blazek's "high reassignment rate," which MAS placed in the "orange" range of its scorecard. *Id.* ¶¶ 53-54. Plaintiffs allege those reassignment rates were not valid performance measures but the product of MAS's scheduling practices, platform limitations, and overlapping assignments. *Id.* ¶¶ 35-38, 52, 61.

Plaintiffs allege MAS failed to provide the contractual protections required before termination. MAS did not give ninety days' notice for a no-cause termination, thirty days' written notice of any material breach, a written description of any breach, a ten-day cure opportunity, or a corrective-action-plan process. Compl. ¶¶ 55-57, 62. Plaintiffs further allege no contractual default existed because they did not engage in fraud, threats, insurance lapses, or other conduct permitting immediate termination. *Id.* ¶ 58.

After termination, Plaintiffs attempted to invoke the contractual appeal process. Compl. ¶¶63-64. Blazek requested meetings with MAS decision-makers to explain how MAS's scheduling system inflated his reassignment rate, but MAS denied or ignored those requests, refused meaningful review, and rubber-stamped its decision. *Id.* ¶¶6 4-65. Plaintiffs allege MAS used the same perfunctory process for Kendrick and Absolute 1. *Id.* ¶ 66.

The terminations destroyed Plaintiffs' Medicaid transportation businesses, causing loss of current and future business, customer relationships, profits, and business value. Compl. ¶¶ 59, 62, 105, 109-110, 124. Blazek also alleges MAS rendered his recent $30,000 vehicle investment economically irrational. *Id.* ¶¶ 51, 114-116. In sum, Plaintiffs allege MAS created impossible assignments, converted necessary refusals into inflated negative metrics, assured providers those metrics would not be punitive, and then used them to terminate Plaintiffs without honoring contractual notice, cure, corrective-action, or appeal rights. *Id.* ¶¶ 31-38, 50-66, 103-110.

## LEGAL STANDARD

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of the complaint; it does not permit the Court to resolve factual disputes, weigh competing inferences, or decide the merits of Plaintiffs' claims. To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The plausibility standard is not a probability requirement; it asks only for enough factual content to permit a reasonable inference of liability. *Iqbal*, 556 U.S. at 678. Thus, while "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

In applying that standard, the Court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). The Court generally confines its review to the complaint itself. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016); *Chambers*, 282 F.3d at 153. Moreover, the Court may not use a Rule 12(b)(6) motion to accept a defendant's factual characterization of disputed documents or to draw defendant-favorable inferences from materials outside the pleadings.

A defendant's contention that a plaintiff has failed to plead or prove an element of a federal cause of action generally goes to the merits, not to subject-matter jurisdiction. *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361–66 (2d Cir. 2000). Federal-question jurisdiction is not defeated merely because a defendant argues that the federal claim fails; dismissal for lack of subject-matter jurisdiction is appropriate only where the federal claim is immaterial, asserted solely to obtain jurisdiction, or wholly insubstantial and frivolous. *See Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000). Accordingly, where a complaint pleads a non-frivolous federal claim, disputes over the sufficiency of that claim are ordinarily addressed under Rule 12(b)(6), not Rule 12(b)(1).

Supplemental jurisdiction is governed by 28 U.S.C. § 1367. In any civil action over which the district court has original jurisdiction, the court also has supplemental jurisdiction over "all other claims" that are so related to the claims within the court's original jurisdiction that they form part of the same Article III case or controversy. 28 U.S.C. § 1367(a). Claims form part of the same case or controversy when they "derive from a common nucleus of operative fact" such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *see also Briarpatch Ltd., L.P. v. Phoenix*

6

*Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004). The claims need not be identical, and they need not require proof of every same fact. It is enough that the federal and state claims substantially overlap or arise from the same course of conduct, relationship, policies, or transactions. *See id.*

A district court may decline supplemental jurisdiction only in the circumstances set forth in § 1367(c): where the state-law claim raises a novel or complex issue of state law; substantially predominates over the claim or claims within original jurisdiction; the court has dismissed all claims over which it has original jurisdiction; or exceptional circumstances present other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). Even where one of those statutory predicates exists, the decision remains discretionary and must be guided by "judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

## ARGUMENT

### I.   PLAINTIFFS HAVE PLAUSIBLY PLEADED THEIR FLSA CLAIM

Defendant moves to dismiss the FLSA claim on two grounds. *First*, MAS argues Plaintiffs have not plausibly alleged that MAS was their employer under either the Second Circuit's formal-control test in *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984), or the functional-control test in *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003). *Second*, MAS argues that Plaintiffs do not plead a specific workweek or precise amount of unpaid overtime. Def. Mem. at 22-23.

Both arguments improperly seek resolution of a fact-intensive economic-realities inquiry at the pleading stage. The Court must accept the Complaint's allegations as true, draw reasonable inferences for Plaintiffs, and decide whether an FLSA employment relationship and overtime violation are plausibly alleged.

7

A.    Plaintiffs Plausibly Allege That MAS Was Their Employer

The FLSA's definition of employer has a "strikingly breadth" and not limited by common-law employment concepts. *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141-43 (2d Cir. 2008). The Act defines "employee" as "any individual employed by an employer" and "employ" to include "to suffer or permit to work." 29 U.S.C. §§ 203(e)(1), 203(g). That definition is broad because of the Act's remedial purpose. *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945).

Courts examine the "economic reality" of the relationship, not labels or formal structures. *Carter*, 735 F.2d at 12; *Zheng*, 355 F.3d at 66. The central question is economic dependence. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988). A joint-employer relationship may exist where one entity has "immediate control" over another company's employees. *Woodman v. WWOR-TV*, Inc., 411 F.3d 69, 89 (2d Cir. 2005). Relevant factors include hiring and firing authority, supervision and control over schedules or work conditions, rate and method of payment, and employment records. *Zheng*, 355 F.3d at 67. These factors are nonexclusive, and no single factor controls. *Barfield*, 537 F.3d at 143.

The Complaint plausibly alleges substantial MAS control. MAS serves as statewide Medicaid transportation broker, controls Medicaid-rider access, receives ride requests, assigns trips, manages the provider network, administers the mandatory software platform, controls performance metrics, and determines provider eligibility. Compl. ¶¶17-24. MAS "operates as the gatekeeper to Medicaid NEMT riders," and providers "cannot build an independent Medicaid-rider customer base outside MAS's network." *Id.* ¶ 19. MAS also sets compensation rates, requires its platform, imposes timing and performance requirements, maintains scorecards, tracks

8

reassignment/refusal rates, and uses those metrics to discipline and terminate providers. *Id.* ¶¶ 20-22, 37, 42, 47, 68-70.

Those allegations satisfy multiple *Carter* factors. MAS exercised "exclusive control over trip assignment and access to Medicaid riders," required "mandatory use of MAS's secure platform," imposed "strict timing requirements," and had "the practical ability to terminate access to all Medicaid transportation work on one day's notice." Compl. ¶¶ 42, 47. MAS controlled the volume and timing of work, constrained drivers' profit or loss, and controlled compensation-generating assignments. *Id.* ¶¶ 67-70. MAS also terminated AOT and Absolute 1, eliminating Plaintiffs' ability to continue Medicaid transportation work. *Id.* ¶¶ 53-62. These facts plausibly allege immediate control.

The Complaint also pleads *Zheng* functional control. MAS's business model "depends on a statewide workforce of drivers who perform NEMT rides that are integral to MAS's broker operations," and MAS controlled customers, assignments, work volume, profit opportunities, and integration of driver labor into its Medicaid transportation system. Compl. ¶¶ 67-70. Those allegations directly support economic dependence. *See Zheng*, 355 F.3d at 66-72; *Brock*, 840 F.2d at 1059.

MAS's contrary arguments rely on competing factual inferences and materials outside the Complaint, including provider contracts, the Medicaid Transportation Policy Manual, and MAS's characterization of the regulatory framework. Def. Mem. at 14-21. Those arguments may matter later, but not on Rule 12(b)(6). The Complaint alleges MAS's control extended beyond regulatory compliance into day-to-day operation of the Medicaid transportation marketplace: customer access, work assignments, rates, platform use, refusals, scorecards, discipline, and termination.

9

Compl. ¶¶19-22, 37-38, 42-43, 47, 68-71. Taken together, those allegations plausibly plead an FLSA employment relationship.

Furthermore, MAS's reliance on *Harris* and *Godlewska* underscores why dismissal is premature. Both courts rejected joint-employer status only on full summary-judgment records, after discovery—not on the pleadings. *See Harris v. Med. Transp. Mgmt., Inc.*, No. 17-cv-1371, 2025 U.S. Dist. LEXIS 206499, at *33-60 (D.D.C. Apr. 11, 2025); *Godlewska v. HDA*, 916 F. Supp. 2d 246, 259-65 (E.D.N.Y. 2013), *aff'd*, 561 F. App'x 108 (2d Cir. 2014). MAS itself concedes that *Harris* was decided "at summary judgment." Def. Mem. at 13. The economic-reality inquiry is intensely fact-bound, and the Court cannot resolve it now by crediting MAS's evidentiary submissions and drawing inferences in MAS's favor. At this stage the only question is whether Plaintiffs have alleged enough to make joint employment plausible—and, for the reasons above, they have.

MAS's central theme—that everything it is alleged to control merely reflects its statutory role as New York's NEMT broker—cannot carry a motion to dismiss. As an initial matter, whether the alleged control is "merely regulatory" or instead reflects employer-like domination is the very fact question that *Carter* and *Zheng* commit to the merits. In any event, the Complaint alleges control that no statute or regulation compels. Nothing in 42 C.F.R. § 440.170 or Social Services Law § 365-h(4)(b) requires MAS to design a platform that bars providers from blocking discrete time windows, to assign overlapping or impossible trips, to convert legally required refusals into negative "reassignment" metrics, or to use those self-generated metrics to terminate providers. Compl. ¶¶ 32-38, 53-66. That is the manipulation of a system MAS built—not the neutral "quality control" approved in *Godlewska*. *See Godlewska*, 916 F. Supp. 2d at 259 (quality control "to ensure

10

compliance with the law or protect clients' safety" does not establish employer control). Read in Plaintiffs' favor, MAS penalized Plaintiffs for doing exactly what safety and the law required.

Nor can MAS sidestep these allegations by asking the Court to adopt its own reading of the provider contracts and the NYS Manual. Even where such documents are integral to a complaint, the Court may consider their terms but may not draw disputed, defendant-favorable inferences from them against the pleader. To the extent MAS relies on those materials to argue that the State set the rates, that payment ran through eMedNY, or that MAS's control was contractually cabined, those are merits contentions that cannot displace the Complaint's well-pleaded allegations on a Rule 12(b)(6) motion.

B.    Plaintiffs Plausibly Allege Minimum-Wage and Overtime Violations

MAS next argues that Plaintiffs fail to plead a specific overtime or minimum-wage violation. Def. Mem. at 22-23. The FLSA requires overtime pay when an employer "employ[s] any of his employees . . . for a workweek longer than forty hours." *Abbott v. Comme Des Garcons, Ltd.*, 84 F.4th 110, 114 (2d Cir. 2023) (quoting 29 U.S.C. § 207(a)(1) (alteration in original). To plead overtime, a plaintiff must allege "40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013); *see also Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013); *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89-90 (2d Cir. 2013).

In reliance on this, MAS overstates this burden. The Second Circuit does not require week-by-week records, time sheets, or damages calculations at the pleading stage. Plaintiffs need only allege enough facts to support a plausible inference that they worked more than forty hours in at

11

least one workweek and were not paid overtime. *Lundy*, 711 F.3d at 114; *Nakahata*, 723 F.3d at 201; *Dejesus*, 726 F.3d at 89-90.

Plaintiffs plead the nature of the work, Compl. ¶¶17-24, 40-41, 45-46; the duration of the work relationships, *Id.* ¶¶40, 45; the regularity of the work, *Id.* ¶¶41, 46; the MAS-assigned source of the work, *Id.* ¶¶17-24, 40-41, 45-46; and the failure to pay overtime premiums, *Id.* ¶¶44, 48, 90. Blazek alleges he provided NEMT services through MAS's platform from approximately 2021 through March 2025, that the work was his primary occupation and income source, and that he "routinely worked well over forty (40) hours per week, including early mornings, evenings, and weekends, to fulfill MAS-assigned rides." *Id.* ¶¶40-41. Kendrick likewise alleges he routinely worked more than forty hours per week fulfilling MAS-assigned rides. *Id.* ¶¶45-46. Both allege MAS classified them as independent contractors and did not pay overtime. *Id.* ¶¶44, 48. Count I alleges failure to pay one-and-one-half times the regular rate for hours over forty. *Id.* ¶90.

These allegations exceed the bare pleadings rejected in *Lundy*, *Nakahata*, and *Dejesus*. Those complaints lacked enough factual context to infer uncompensated work over forty hours in a given week. *See Lundy*, 711 F.3d at 114-15; *Nakahata*, 723 F.3d at 201; *Dejesus*, 726 F.3d at 89-90. Here, Plaintiffs allege recurring work over forty hours, MAS-assigned rides, early mornings, evenings, weekends, and nonpayment of overtime premiums. Compl. ¶¶40-48, 90.

*Abbott* confirms that plaintiffs who plausibly allege more than forty hours for multiple weeks without overtime need not provide "a week-by-week recounting of the hours they worked." *Abbott,* 84 F.4th at 115. The pleading need only make the overtime claim plausible. *Id.* at 116-18; *see also Nakahata*, 723 F.3d at 201. Plaintiffs' allegations satisfy that standard.

Nor does MAS's minimum-wage argument require dismissal. Def. Mem. at 22-23. Count I survives because Plaintiffs plausibly allege an overtime violation, independent of any separate

minimum-wage theory. Compl. ¶¶40-48, 86-93. The Complaint gives MAS fair notice: Plaintiffs were classified as independent contractors, regularly worked more than forty hours per week performing MAS-assigned Medicaid transportation rides, and were not paid overtime premiums. *Id.* ¶¶40-48, 90. Nothing more is required at this stage.

## II.    PLAINTIFFS' STATE-LAW CLAIMS ARE PLAUSIBLY PLEADED

Defendant's Rule 12(b)(6) attack on Plaintiffs' state-law claims should also be rejected. Defendant asks the Court to draw factual inferences in MAS's favor, construe disputed contract provisions against Plaintiffs, and treat MAS's alleged platform control, metric manipulation, promises, rider diversion, and termination decisions as benign contract administration. That is not the pleading standard. At this stage, the Court must accept Plaintiffs' factual allegations as true and draw all reasonable inferences in Plaintiffs' favor.

### C.    Count II: Plaintiffs Plausibly Plead Their NYLL Wage Claim

The NYLL claim survives for the same reasons the FLSA claim survives. Defendant argues that Blazek and Kendrick fail to state a NYLL claim because they have not plausibly alleged an employment relationship or a wage violation. Def. Mem. at 27. But the Complaint alleges that MAS controlled access to Medicaid riders, assigned trips, required use of its platform, imposed timing and performance requirements, controlled compensation-generating opportunities, tracked refusal and reassignment metrics, classified Plaintiffs as independent contractors, and failed to pay overtime premiums despite workweeks exceeding forty hours. Compl. ¶¶17-22, 37-48, 67-75, 95-99.

Those allegations plausibly plead employment and wage liability under the NYLL. The Complaint alleges that Blazek provided NEMT services through MAS's platform and at MAS's direction from approximately 2021 through March 2025, that the work was his primary occupation

and source of income, and that he routinely worked well over forty hours per week, including early mornings, evenings, and weekends, to fulfill MAS-assigned rides. Compl. ¶¶40-41. The Complaint further alleges that MAS exercised pervasive control over Blazek's work through exclusive control over trip assignments and access to Medicaid riders, mandatory use of MAS's secure platform, strict timing requirements, and the practical ability to terminate access to all Medicaid transportation work on one day's notice. *Id.* ¶42. It alleges that Blazek was economically dependent on MAS for NEMT work and could not build an independent Medicaid-rider customer base outside MAS's network. *Id.* ¶43. Despite that control and dependence, MAS classified Blazek as an independent contractor and failed to pay overtime premiums when he worked more than forty hours per week. *Id.* ¶44.

The Complaint makes parallel allegations as to Kendrick. Kendrick provided NEMT services through Absolute 1 via MAS's platform and at MAS's direction, performed that work as a primary occupation and source of income, and routinely worked more than forty hours per week fulfilling MAS-assigned rides. Compl. ¶¶45-46. MAS exercised the same pervasive control over Kendrick and Absolute 1 that it exercised over Blazek and AOT, including exclusive control over trip assignments and access to Medicaid riders, mandatory platform use, strict timing requirements, unilateral rate setting, performance dashboards, and unilateral termination authority. *Id.* ¶47. MAS classified Kendrick as an independent contractor and failed to pay overtime premiums when he worked more than forty hours per week. *Id.* ¶48.

Count II then expressly alleges that Blazek and Kendrick were employees and MAS was an employer under the NYLL, that they regularly worked more than forty hours per week providing NEMT services through MAS's network, that MAS failed to pay overtime premiums and, at times, proper minimum wage and spread-of-hours compensation, anxd that MAS's NYLL violations

14

were willful. Compl. ¶¶95-99. Courts generally analyze NYLL employer status under the same or a substantially similar economic-realities framework applied under the FLSA. *See Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 923-24 (S.D.N.Y. 2013). Because Plaintiffs plausibly allege that MAS was their employer and failed to pay required overtime compensation, Count II is adequately pleaded.

D.    Count III: Plaintiffs Plausibly Plead Breach of Contract

Count III is not properly subject to dismissal under Rule 12(b)(6). Defendant's merits section does not meaningfully attack the sufficiency of the breach-of-contract claim, and for good reason: the Complaint pleads each element of a contract claim with specificity.

Under New York law, a breach-of-contract claim requires allegations of a contract, plaintiff's performance, defendant's breach, and damages. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). The Complaint pleads all four elements. First, Plaintiffs allege that MAS entered into written Transportation Provider Network Contracts with AOT and Absolute 1. Compl. ¶¶26-28, 101. Specifically, MAS and AOT entered into the AOT Contract on or about January 3, 2024, governing MAS's assignment of trips to AOT and AOT's provision of NEMT services to Medicaid enrollees. *Id.* ¶26. MAS and Absolute 1 entered into a materially identical contract on or about September 29, 2021. *Id.* ¶27. The Complaint also identifies key contractual provisions, including Section 24, Section 43.1, Section 43.2, Section 43.3, Section 45, and Section 47. *Id.* ¶28.

Second, Plaintiffs allege performance. AOT and Absolute 1 performed their obligations under the contracts and complied with the Manual and applicable law. Compl. ¶¶30, 102. Plaintiffs further allege that they did the responsible and contract-compliant thing when they refused or sought reassignment of trips that were unsafe, unlawful, or impossible to perform on time. *Id.*

15

¶¶34-36. They also allege that Blazek's rides were completed without complaints or discipline regarding quality of service. *Id.* ¶49.

Third, Plaintiffs plead multiple contractual breaches. MAS violated Section 24 by assigning trips that providers could not reasonably accommodate based on their Transportation Provider Profiles and known availability. Compl. ¶¶28(a), 32-36, 103(a). MAS failed to provide ninety days' notice for a no-cause termination under Section 43.1. *Id.* ¶¶28(b), 55, 103(a). MAS failed to provide thirty days' written notice of any alleged material breach and a ten-day cure opportunity under Section 43.2. *Id.* ¶¶28(c), 56, 103(b). MAS invoked immediate termination without a qualifying default under Section 43.3, even though Plaintiffs did not engage in fraud, threatening conduct, insurance lapses, or other defined default conduct. *Id.* ¶¶28(d), 58. MAS failed to request or invite AOT to submit a corrective action plan as contemplated by Section 45. *Id.* ¶¶28(e), 57, 103(c). MAS also failed to honor the appeal process and meeting requirement under Section 47. *Id.* ¶¶28(f), 63-66, 103(d).

Fourth, Plaintiffs plead damages. MAS terminated AOT from the MAS network effective March 28, 2025, on one day's notice, destroying AOT's business as a Medicaid transportation provider, eliminating ongoing income, and rendering Blazek's recent vehicle investment economically irrational. Compl. ¶¶53-59.

MAS likewise terminated Kendrick and Absolute 1 effective March 21, 2025, based on the same or similar metric-based rationale, without providing contractual notice, cure, corrective-process options, or a good-faith appeal process. Compl. ¶¶60-62. Count III alleges that, as a direct and proximate result of MAS's breaches, AOT, Absolute 1, and the Provider Contract and Termination Class suffered substantial damages, including loss of current and future business, lost profits, and destruction of provider business value. *Id.* ¶105.

The Complaint also plausibly alleges that MAS's stated termination rationale cannot excuse its breaches because the "high reassignment rate" MAS relied upon was the direct product of MAS's own structural violations of the contracts and the Manual, including overbooking and scheduling practices. Compl. ¶¶32-38, 52, 54, 60-61, 104. That allegation directly defeats any argument that MAS's terminations were justified as a matter of law at the pleading stage. At minimum, whether MAS complied with the contracts, whether its metric-based termination rationale was valid, whether Plaintiffs performed, and whether MAS's own scheduling system caused the alleged reassignment rates are fact questions that cannot be resolved on a Rule 12(b)(6) motion.

Accordingly, Count III is adequately pleaded and should remain in the case.

E.      Count IV: Plaintiffs Plausibly Plead Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendant's attack on the implied-covenant claim also fails. Under New York law, every contract includes an implied covenant of good faith and fair dealing, which prevents either party from doing anything that would destroy or injure the other party's right to receive the benefits of the agreement. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995); *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002). That principle is particularly relevant where one party exercises contractual discretion in bad faith. *See Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302 (1st Dep't 2003).

The Complaint alleges more than a simple disagreement over contract termination. Plaintiffs allege that MAS controlled the provider network, trip assignments, performance metrics, provider discipline, and terminations through its centralized platform and policies. Compl. ¶¶17-22. Plaintiffs further allege that MAS's platform permitted providers to block entire days, but not specific time windows, which caused MAS to repeatedly assign trips during periods when

Plaintiffs were already committed to previously assigned rides or were physically located miles away. *Id.* ¶¶32-33. MAS tracked necessary refusals or reassignments as negative performance metrics, even when the assignments were unsafe, unlawful, or impossible to perform on time. *Id.* ¶¶34-35. Plaintiffs allege that MAS maintained internal scorecards or dashboards for providers and color-coded reassignment or refusal metrics based on MAS-determined thresholds. *Id.* ¶37. Plaintiffs further allege that MAS's reassignment-rate metric was unreliable because it was materially driven by MAS's own scheduling practices and platform limitations. *Id.* ¶38.

Those allegations directly support an implied-covenant theory. Plaintiffs allege that MAS used inflated metrics generated by its own flawed system as a pretext to terminate providers and divert riders to other vendors. Compl. ¶¶2, 52, 61, 108-109. MAS terminated Blazek/AOT on one day's notice, cited Blazek's alleged high reassignment rate, failed to provide ninety days' notice of a no-cause termination, failed to provide thirty days' notice and an opportunity to cure any alleged material breach, failed to request or invite a corrective action plan, and relied on metrics that Plaintiffs allege MAS itself inflated. *Id.* ¶¶53-59. MAS likewise terminated Kendrick/Absolute 1 on one day's notice based on a high reassignment rate or substantially similar metric-based justification and failed to provide the required notice, cure opportunity, corrective-process options, or good-faith appeal process. *Id.* ¶¶60-62.

The Complaint also alleges bad-faith review after termination. MAS's provider contracts required an appeal process under which MAS representatives would meet with the provider "with the intent of resolving the dispute." Compl. ¶63. Blazek requested meetings with MAS decision-makers to appeal the termination and explain the scheduling problems that inflated his reassignment rate. *Id.* ¶64. MAS denied or ignored those requests, refused to meet in good faith, conducted a perfunctory internal review, and rubber-stamped its own termination decision. *Id.* ¶65.

MAS applied the same perfunctory, non-independent appeal process to Kendrick and Absolute 1. *Id.* ¶66.

Count IV incorporates those factual allegations and alleges that MAS breached the implied covenant by manipulating its scheduling and roster systems so that providers would incur excessive reassignment metrics simply by complying with the contract and the law, using those inflated metrics as a pretext to terminate providers and divert riders to other vendors, and refusing to engage in good-faith appeals or corrective processes. Compl. ¶¶106-110. Plaintiffs further allege that MAS deprived AOT, Absolute 1, and similarly situated providers of the fruits of the contractual bargain, including the ability to continue operating as Medicaid transportation providers and reap the benefits of their developed rider relationships. *Id.* ¶109. Those allegations plausibly plead bad-faith administration of the provider relationship and deprivation of the benefits of the contract.

Defendant's duplication argument does not require dismissal at this stage. Plaintiffs do not merely allege that MAS breached express notice provisions. They allege that MAS manipulated or misused performance metrics, created impossible assignments, used inflated reassignment data as a pretext, diverted riders, and refused good-faith appeals. Compl. ¶¶32-38, 52-66, 108-110. Those allegations target MAS's bad-faith exercise of discretion and its alleged destruction of the contractual relationship's value. At minimum, Plaintiffs may plead that theory in the alternative at the motion-to-dismiss stage.

F.      Count V: Plaintiffs Plausibly Plead Promissory Estoppel

The promissory-estoppel claim is also adequately pleaded. Under New York law, promissory estoppel requires a clear and unambiguous promise, reasonable and foreseeable

19

reliance, and injury caused by that reliance. *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995); *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

Plaintiffs allege exactly that. MAS, through a field liaison named Arias, assured Blazek in writing that "reassignment rates are not punitive," or words to that effect. Compl. ¶50. Relying on that assurance, Blazek continued to accept rides and manage schedules as before and, in March 2025, purchased a second vehicle for approximately $30,000 to expand his NEMT business within MAS's network. *Id.* ¶51. Contrary to Arias's assurance, MAS later relied primarily or exclusively on Blazek's reassignment rate—which MAS itself had artificially inflated through its flawed system—to justify termination. *Id.* ¶52. MAS terminated Blazek/AOT from the network effective March 28, 2025, on one day's notice, citing Blazek's alleged high reassignment rate. *Id.* ¶¶53-54.

Count V pleads the same theory with the required elements. Plaintiffs allege that MAS, through Arias, made a clear and unambiguous promise to Blazek that reassignment rates were not punitive. Compl. ¶112. Plaintiffs allege that MAS reasonably should have expected Blazek to rely on that assurance in structuring his business and making investment decisions. *Id.* ¶113. Plaintiffs allege that Blazek reasonably relied on the promise by continuing to operate within MAS's system, accepting rides, and investing approximately $30,000 in a second vehicle to expand his MAS-based NEMT business. *Id.* ¶114. MAS then terminated Blazek/AOT based on the very reassignment metrics it had promised would not be used punitively. *Id.* ¶115. Plaintiffs allege foreseeable reliance, substantial detriment, loss of business, and wasted investment. *Id.* ¶¶116-17.

Defendant's argument that promissory estoppel is barred by the provider contract is premature. At the pleading stage, Plaintiffs may plead claims in the alternative. Fed. R. Civ. P. 8(d)(2)-(3). That is particularly appropriate where Defendant disputes the scope and effect of the contracts and argues that the alleged promise was not enforceable under the written agreement.

20

The promissory-estoppel claim is also pleaded by Blazek and AOT, and Defendant's contract argument does not resolve at the pleading stage whether Blazek individually has a contract remedy for his reliance-based investment injury. Compl. ¶¶111-17. If MAS contends that the written agreement does not protect Plaintiffs from the conduct alleged, Plaintiffs may plead in the alternative that MAS made extra-contractual assurances on which Plaintiffs reasonably relied. The Complaint alleges the promise, reliance, and injury with sufficient specificity to survive dismissal. *Id.* ¶¶50-52, 112-117.

MAS's remaining attacks on the promissory-estoppel claim turn on factual characterizations that Rule 12 does not permit the Court to resolve. MAS argues that the Arias assurance was not a "clear and unambiguous" promise and that any reliance was unreasonable. Def. Mem. at 29-32. But the Complaint alleges that Arias assured Blazek in writing that "reassignment rates are not punitive"—a concrete representation about the precise metric MAS later invoked to terminate him. Compl. ¶¶ 50, 52. Whether a statement is sufficiently definite, and whether reliance on it was reasonable, are ordinarily fact questions unsuited to dismissal. MAS's contention that a $30,000 vehicle purchase was a disproportionate response is no different: the Complaint alleges that Blazek bought the vehicle to expand his MAS-based business in direct reliance on MAS's assurance that the metric would not be held against him. Compl. ¶¶ 51, 114. Drawing all inferences in Blazek's favor, those allegations state a plausible claim; MAS's competing version of events must await summary judgment.

G.    Count VI: Plaintiffs Plausibly Plead Tortious Interference with Business Relations / Prospective Economic Advantage

The tortious-interference claim is properly pled. To plead tortious interference with prospective business relations under New York law, a plaintiff must allege business relations with

21

a third party, defendant's interference with those relations, wrongful means or action for the sole purpose of harming the plaintiff, and injury. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189-91 (2004); *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621 (1996). Wrongful means may include fraud, misrepresentation, economic pressure, or other independently wrongful conduct. *Carvel*, 3 N.Y.3d at 191.

The Complaint plausibly pleads each element. Plaintiffs allege ongoing and prospective business relationships with Medicaid enrollees who regularly used their services, including standing orders and recurring trips to medical and mental-health appointments. Compl. ¶119. Plaintiffs further allege a reasonable expectation of continued repeat business from those enrollees and additional enrollees using MAS to schedule rides. *Id.* ¶120. MAS knew of those relationships and expectations because those relationships existed because MAS assigned riders to Plaintiffs. *Id.* ¶121.

The Complaint then alleges intentional and unjustifiable interference. MAS designed and operated a scheduling and metrics system that ensured Plaintiffs would accumulate inflated reassignment rates when they complied with safety and legal requirements. Compl. ¶122(a). MAS used those inflated metrics as a pretext to terminate Plaintiffs. *Id.* ¶122(b). MAS then reallocated Plaintiffs' riders and established customer base to other transportation companies for MAS's benefit. *Id.* ¶122(c). Plaintiffs further allege that MAS acted with malice and improper motive, including a preference for larger providers that generated greater gross revenues and a desire to eliminate smaller, sole-operator providers from its network. *Id.* ¶123. Plaintiffs allege resulting loss of ongoing and prospective business, customer-base value, and substantial present and future profits. *Id.* ¶124.

22

These allegations are not conclusory. Earlier factual allegations explain how the alleged interference occurred. MAS operated as the gatekeeper to Medicaid NEMT riders and controlled providers' access to rider demand. Compl. ¶19. MAS controlled the compensation structure and trip assignments. *Id.* ¶¶18, 20. MAS required use of its platform and roster system to receive reservations, accept or decline assignments, and manage schedules. *Id.* ¶21. MAS imposed timing requirements that created compliance pressure when assignments were unrealistic. *Id.* ¶22. MAS maintained scorecards and dashboards tracking reassignment or refusal metrics based on MAS-determined thresholds. *Id.* ¶37. Plaintiffs allege that those metrics were unreliable because they were materially driven by MAS's own scheduling practices and platform limitations. *Id.* ¶38. Plaintiffs allege that MAS's financial structures created incentives to prefer larger providers and eliminate smaller providers who could not safely absorb impossible scheduling assignments. *Id.* ¶31. Those factual allegations support the pleaded inference that MAS interfered with Plaintiffs' business relationships through wrongful use of its platform, metrics, and gatekeeper control.

Defendant's argument that Plaintiffs fail to identify third-party relationships is too demanding at the pleading stage. Plaintiffs identify the relevant relationships: Medicaid enrollees who regularly used their services, including standing orders and recurring trips to medical and mental-health appointments. Compl. ¶119. Plaintiffs allege a reasonable expectation of continued repeat business from those enrollees and additional enrollees using MAS to schedule rides. *Id.* ¶120. Plaintiffs allege MAS's knowledge of those relationships because MAS assigned riders to Plaintiffs. *Id.* ¶121. The details of particular riders, assignments, diversions, and communications are reflected in or controlled by MAS's platform and trip-assignment records and are proper subjects for discovery.

23

Nor is the tortious-interference claim merely duplicative of the contract claim. The contract claim concerns MAS's breaches of specific provider-contract provisions, including Section 24, Section 43.1, Section 43.2, Section 45, and Section 47. Compl. ¶¶101-105. The tortious-interference claim concerns MAS's alleged interference with Plaintiffs' relationships and expectancies with third-party Medicaid enrollees, including alleged rider reallocation and diversion to other transportation companies. *Id.* ¶¶119-124. Those allegations involve third-party business relationships and prospective economic advantage distinct from the provider contracts themselves.

MAS's final argument—that the claim targets MAS's conduct toward Plaintiffs rather than toward the Medicaid enrollees—misreads the Complaint. Def. Mem. at 34. Plaintiffs allege exactly the third-party-directed conduct Carvel describes: MAS reallocated and diverted Plaintiffs' established Medicaid riders to competing transportation companies, severing the enrollee relationships themselves. Compl. ¶¶ 122, 124. That is interference aimed at the relationships between Plaintiffs and the enrollees, accomplished through wrongful means—MAS's manipulation of a metrics system it alone controlled. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004). And because Plaintiffs allege wrongful means, they need not show that MAS acted for the sole purpose of harming them; MAS's economic self-interest does not defeat a claim premised on independently improper conduct. *Id.*

Accordingly, the state-law claims should not be dismissed. Count II tracks the same wage-and-hour facts as Count I and plausibly alleges NYLL liability. Count III plausibly alleges breach of written provider contracts. Count IV plausibly alleges bad-faith administration and termination of the provider relationship. Count V is properly pleaded in the alternative based on MAS's alleged promise, Plaintiffs' reliance, and resulting injury. Count VI plausibly alleges that MAS used

wrongful platform control, inflated metrics, termination, and rider reallocation to interfere with Plaintiffs' ongoing and prospective business relationships.

## III.   THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE-LAW CLAIMS

Defendant's request that the Court decline supplemental jurisdiction should be rejected. If Count I survives, the Court has original federal-question jurisdiction over Plaintiffs' FLSA claim. The remaining question under 28 U.S.C. § 1367(a) is whether the state-law claims are "so related" to Count I that they form part of the same Article III case or controversy. They are for the simple reason that claims form part of the same case or controversy when they "derive from a common nucleus of operative fact." *Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*, 134 F.4th 73, 79 (2d Cir. 2025). The Second Circuit asks whether the facts underlying the federal and state claims substantially overlap or whether the federal claim necessarily brings the facts underlying the state claims before the Court. *Id.* at 80.

Count II easily satisfies that standard. Defendant's argument notably addresses Counts III through VI, but Count II is the closest state-law analogue to Count I. It arises from the same alleged wage-and-hour facts: Plaintiffs' work performing MAS-assigned NEMT rides, MAS's alleged control over their work, Plaintiffs' regular workweeks exceeding forty hours, MAS's classification of Plaintiffs as independent contractors, and MAS's alleged failure to pay required overtime compensation. Compl. ¶¶40-48, 67-75, 86-93. Count II therefore does not merely share a common nucleus of operative fact with Count I; it rests on the same core facts. If the FLSA claim survives, supplemental jurisdiction over Count II is plainly proper.

The same is true of Counts III through VI. Those claims arise from the same MAS-controlled NEMT provider relationship that supplies the factual basis for Count I. The FLSA claim

25

requires the Court to examine MAS's alleged control over access to Medicaid riders, trip assignments, platform use, timing and performance requirements, compensation-generating opportunities, refusal and reassignment metrics, and termination of access to Medicaid transportation work. Compl. ¶¶17-24, 37-48, 67-71, 86-93. Counts III through VI require the Court to examine the same provider contracts, the same MAS platform, the same assignment system, the same performance metrics, the same alleged manipulation or use of reassignment data, the same alleged promises concerning continued participation, and the same termination of AOT and Absolute 1 from the MAS network. *Id.* ¶¶26-38, 49-62, 67-71. The overlap is direct and substantial.

Defendant attempts to separate the claims by characterizing Count I as a "labor" claim and Counts III through VI as "non-labor" contract and tort claims. Def. Mem. at 25. But supplemental jurisdiction turns on factual overlap, not labels. The central factual question in Count I is whether MAS exercised employer-like control over Plaintiffs as a matter of economic reality. That inquiry necessarily brings before the Court the same facts underlying the state-law claims: how MAS assigned work, controlled access to riders, set or administered compensation, imposed platform rules, tracked performance, used refusal and reassignment metrics, communicated with Plaintiffs, and terminated provider access. Compl. ¶¶17-24, 37-48, 53-62, 67-71. Those facts are not background; they are the heart of the case.

Nor does Defendant's timing argument defeat jurisdiction. Defendant contends that the FLSA claim concerns years of work while the contract and tort claims are concentrated around the March 2025 termination. Def. Mem. at 25. But the Complaint alleges that the March 2025 termination was the culmination of MAS's ongoing control over the provider relationship, including assignments, compensation flow, platform requirements, performance metrics, refusal tracking, reassignment data, and access to Medicaid riders. Compl. ¶¶37-48, 53-62, 67-71. The

termination cannot be understood without the same factual structure that supports the FLSA claim. That is precisely the type of overlap that satisfies § 1367(a). *See Treglia v. Town of Manlius*, 313 F.3d 713, 723 (2d Cir. 2002).

The discretionary factors in § 1367(c) also favor retaining jurisdiction. The state-law claims do not raise novel or complex issues of state law; they are ordinary wage, contract, promissory-estoppel, and tortious-interference claims. 28 U.S.C. § 1367(c)(1). They do not substantially predominate over the FLSA claim because they arise from the same MAS platform, assignment system, compensation structure, performance metrics, provider relationship, and termination decision. *Id.* § 1367(c)(2). The Court has not dismissed all claims over which it has original jurisdiction because Count I survives. *Id.* § 1367(c)(3). And Defendant identifies no exceptional circumstance or compelling reason to split this case into parallel federal and state proceedings. *Id.* § 1367(c)(4).

Judicial economy, convenience, fairness, and comity all favor one forum. *See Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85-86 (2d Cir. 2018). The same witnesses will testify about MAS's role as broker, the provider contracts, the platform, trip assignments, rate and compensation practices, dashboards, scorecards, reassignment and refusal metrics, communications with Plaintiffs, and the March 2025 termination. The same documents and data will be relevant to all claims, including provider contracts, platform records, trip records, compensation records, performance dashboards, termination notices, communications concerning the alleged Arias promise, and records concerning rider assignments or diversion. Requiring Plaintiffs to litigate those overlapping facts in two courts would waste judicial resources, burden the parties, and create a risk of inconsistent factual findings.

Finally, Defendant is wrong to suggest that supplemental jurisdiction fails because different plaintiffs assert different claims. Section 1367(a) expressly extends supplemental jurisdiction to related claims involving the "joinder or intervention of additional parties." 28 U.S.C. § 1367(a); *see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). The relevant question is whether the claims share a common nucleus of operative fact. They do.

Blazek, Kendrick, AOT, and Absolute 1 allege injuries arising from the same MAS-controlled provider relationship, the same NEMT platform, the same trip-assignment and compensation system, and the same termination of access to Medicaid transportation work. Compl. ¶¶12-15, 17-24, 26-38, 40-62, 67-75. The Court should therefore exercise supplemental jurisdiction over all state-law claims, including Count 2 and Counts III through VI.

## IV.    IN THE ALTERNATIVE, THE COURT HAS JURISDICTION UNDER CAFA

Even if the Court were to dismiss Count I, the action should not be dismissed for lack of jurisdiction because the Complaint independently alleges jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). CAFA provides original jurisdiction over a class action where the proposed class contains at least 100 members, minimal diversity exists, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2), (d)(5)(B), (d)(6). The Complaint expressly alleges each requirement. Compl. ¶ 7.

The Rule 23 allegations support those jurisdictional allegations. Plaintiffs bring NYLL and New York common-law claims on behalf of proposed Rule 23 classes. Compl. ¶ 76. The NYLL Wage Class includes all individuals in New York State who performed NEMT driving services for MAS, were classified as independent contractors, and were not paid all wages due, including overtime, under the NYLL during the six years preceding the Complaint. *Id.* ¶ 77. The Provider Contract and Termination Class includes all New York transportation provider entities that

28

contracted with MAS under MAS's Transportation Provider Network Contract, or a materially identical form contract, and were terminated, suspended, or materially disciplined primarily based on reassignment or refusal metrics during the same period. *Id.* ¶ 78. Plaintiffs allege that the classes are so numerous that joinder is impracticable because MAS misclassified numerous drivers statewide and terminated numerous providers under metric-based rationales. *Id.* ¶ 81.

The amount in controversy is also plausibly alleged. CAFA requires aggregation of the claims of the proposed class members. 28 U.S.C. § 1332(d)(6); *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013). The Complaint alleges unpaid wages, overtime, liquidated damages, statutory damages where applicable, attorneys' fees, costs, and interest for the NYLL Wage Class. Compl. ¶¶ 77, 95-99. It also alleges contract and implied-covenant damages for the Provider Contract and Termination Class, including lost current and future business, lost profits, lost business value, consequential damages, and destruction of provider business value. *Id.* ¶¶ 78, 101-110. Those allegations plausibly exceed $5 million in the aggregate, particularly given the alleged statewide classes, six-year period, unpaid wage and overtime claims, liquidated damages, lost-profit claims, and alleged destruction of provider businesses. *Id.* ¶¶ 7, 77-81, 95-110.

MAS's minimal-diversity argument is premature and too narrow. CAFA requires only that "any member of a class of plaintiffs" be a citizen of a state different from "any defendant." 28 U.S.C. § 1332(d)(2)(A). MAS focuses on the citizenship of the named Plaintiffs and Defendant, but CAFA minimal diversity is measured by the proposed class, not merely the named parties. Compl. ¶¶ 7, 76-81. MAS also relies on driver-license information, asserting that approximately 97.5% of drivers are licensed in New York. Def. Mem. at 8. But driver-license data is not citizenship, and it does not address the citizenship of every proposed class member, including provider entities whose citizenship depends on the citizenship of their members. Nor does it

29

establish that no proposed class member is diverse from MAS. At most, MAS's submission creates a factual issue inappropriate for dismissal without jurisdictional discovery.

The home-state exception does not change the result at this stage. CAFA's home-state exception requires the Court to decline jurisdiction only where two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the state in which the action was originally filed. 28 U.S.C. § 1332(d)(4)(B). That exception is not jurisdictional; it is an exception to otherwise existing CAFA jurisdiction. *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 142 (2d Cir. 2013). MAS bears the burden of establishing that the exception applies, and it has not done so on the pleadings. Its reliance on New York driver's licenses does not establish New York citizenship for two-thirds of all proposed class members in the aggregate, and it does not account for the citizenship of provider entities in the Provider Contract and Termination Class. Def. Mem. at 8; Compl. ¶¶ 76-81. MAS's passing invocation of the discretionary exception under 28 U.S.C. § 1332(d)(3) fares no better. That provision applies only where more than one-third but less than two-thirds of the proposed class are citizens of the forum state, and it directs the Court to decline jurisdiction only after weighing six statutory factors—an inquiry MAS never undertakes and that cannot be resolved on the pleadings.

Nor should the Court dismiss Counts V and VI if CAFA supplies original jurisdiction over the Rule 23 claims. Once the Court has original jurisdiction over the CAFA class claims, it may exercise supplemental jurisdiction over related non-class claims that form part of the same case or controversy. 28 U.S.C. § 1367(a). Counts V and VI arise from the same MAS-controlled provider relationship, the same scheduling platform, the same reassignment metrics, the same alleged Arias assurance, the same terminations, and the same alleged reallocation of rider relationships. Compl.

30

¶¶ 50-66, 111-124. Thus, if CAFA jurisdiction exists over Counts II through IV, supplemental jurisdiction also exists over Counts V and VI.

Accordingly, even if the Court were to dismiss the FLSA claim, dismissal of the entire action would still be improper. Plaintiffs have alleged CAFA jurisdiction over the Rule 23 claims, and MAS's contrary arguments depend on factual assertions that do not defeat jurisdiction on the pleadings. At minimum, if the Court concludes that the CAFA record is incomplete, Plaintiffs should be permitted jurisdictional discovery rather than having their class claims dismissed at the threshold.

## V.    ANY DISMISSAL SHOULD BE WITH LEAVE TO AMEND

Even if the Court were to find any claim insufficiently pleaded, dismissal with prejudice would be inappropriate. The Federal Rules of Civil Procedure provide that courts "should freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). As the Second Circuit has explained, "[t]his permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (citation omitted). Leave to amend should be granted "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see also Couloute v. Ryncarz*, No. 11-CV-5986 (HB), 2012 WL 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (*quoting Monahan*, 214 F.3d at 283).

None of those factors is present here. MAS's motion comes at the pleading stage, before any discovery has occurred; there has been no undue delay, bad faith, or dilatory motive, and no prejudice to MAS. Nor would amendment be futile: any pleading gap MAS identifies could be cured with additional factual detail drawn largely from MAS's own platform, scheduling, metric,

31

compensation, and termination records—materials uniquely within MAS's control. Accordingly, should the Court find any claim insufficiently pleaded, it should dismiss without prejudice and grant Plaintiffs leave to replead rather than dismiss with prejudice.

## CONCLUSION

Defendant's motion should be denied in its entirety. The Complaint does not plead isolated, unrelated grievances; it pleads one connected course of conduct in which MAS controlled Plaintiffs' access to Medicaid riders, work assignments, compensation-generating opportunities, platform usage, performance metrics, and continued participation in the NEMT marketplace. Read as a whole and with all reasonable inferences drawn in Plaintiffs' favor, those allegations plausibly state claims under the FLSA, the NYLL, and New York common law.

MAS's contrary arguments depend on resolving disputed facts, crediting MAS's regulatory and contractual explanations, and severing the wage, contract, quasi-contract, and tort claims from the common platform, assignment, metric, and termination facts that connect them. Rule 12 does not permit that approach. Plaintiffs have adequately pleaded their federal claim, the Court should exercise supplemental jurisdiction over the related state-law claims, and, in any event, the Complaint independently alleges CAFA jurisdiction over the Rule 23 claims.

Thus, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss in full and grant such other and further relief as the Court deems just and proper. In the alternative, if the Court concludes that any claim requires additional factual detail, Plaintiffs respectfully request leave to amend rather than dismissal with prejudice.

## [SIGNATURE PAGE FOLLOWS]

32

Date:   June 24, 2026
        Jersey City, NJ

                                        Respectfully submitted,

                                        s/ Lee Jacobs

                                        Lee Jacobs, Esq.
                                        Jacobs & Associates
                                        Attorneys for Plaintiffs
                                        97 Newkirk Street, Suite 207
                                        Jersey City, NJ 07306