**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JAMES BLAZEK *et al.*,

Plaintiffs,

-v- 5:26-CV-717 (AJB/CBF)

MEDICAL ANSWERING SERVICES, LLC,

Defendant.

---

**Hon. Anthony Brindisi, U.S. District Judge:**

**DECISION and ORDER**

## I. INTRODUCTION

On February 27, 2026, plaintiffs James Blazek ("Blazek"), Robert Kendrick ("Kendrick"), AOT Transportation Arrive on Time LLC ("AOT"), and Absolute 1 Transport LLC ("Absolute 1") (collectively "plaintiffs") commenced this putative class action against Medical Answering Services, LLC ("MAS" or "defendant"). *See* Dkt. No. 1 ("Compl.").[1] Plaintiffs assert wage-and-hour claims under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") as well as state-law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and tortious interference with business relations or prospective economic advantage. *Id.*

Specifically, plaintiffs' complaint alleges that defendant, which serves as New York State's designated broker for non-emergency medical transportation ("NEMT") services provided to Medicaid recipients, exercised control over transportation providers and their drivers through its

---

[1] This action was initially filed in the Southern District of New York, Dkt. No. 1, but was subsequently transferred to this Court pursuant to a stipulation between the parties, *see* Dkt. No. 9.

scheduling platform, trip assignments, compensation structure, and performance metrics. *See* Compl. ¶¶ 17–22, 31–48. Blazek and Kendrick, who own and operate AOT and Absolute 1, respectively, allege that defendant failed to compensate them for overtime work in violation of the FLSA and NYLL. *Id.* ¶¶ 40–48, 86–99.

Plaintiffs' complaint further alleges that defendant's scheduling practices artificially inflated their reassignment rates, which defendant subsequently relied upon to terminate AOT and Absolute 1 from its transportation provider network in March 2025, without affording them the notice, opportunity to cure, or appeal procedures required under their contracts. Compl. ¶¶ 31–38, 53–66, 100–110. Plaintiffs seek to pursue their wage and hour claims as a collective action under the FLSA and their state-law claims as a class action under Rule 23 of the Federal Rules of Civil Procedure. *Id.* ¶¶ 73–85.

On June 3, 2026, defendant moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 16. Among other things, defendant argues that Blazek and Kendrick have failed to plausibly allege that MAS was their "employer" within the meaning of the FLSA or NYLL or that they suffered legally cognizable wage violations. *See* Dkt. No. 16-5 ("Def.'s Mem."). Defendant further contends that the Court lacks jurisdiction under the Class Action Fairness Act ("CAFA"), codified at 28 U.S.C. § 1332(d), and should decline to exercise supplemental jurisdiction over plaintiffs' state law claims if their FLSA claim is dismissed. *Id.* Alternatively, defendant argues that plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, and tortious interference with prospective business relations fail to state plausible claims upon which relief can be granted. *Id.*

Plaintiffs oppose the motion, Dkt. No. 18, which has been fully briefed, Dkt. No. 21, and will be considered on the basis of the submissions without oral argument.

## II. BACKGROUND

The following facts are taken from the complaint, Dkt. No. 1, and will be assumed true for the purpose of assessing the motion to dismiss.

AOT Transportation is a New York limited liability company owned and operated by Blazek. Compl. ¶ 14. Absolute 1 is a New York limited liability company owned and operated by Kendrick. *Id.* ¶ 15. MAS, a New York limited liability company with its principal place of business in Syracuse, is designated by the New York State Department of Health ("NYSDOH") as the statewide broker for the Medicaid transportation program. *Id.* ¶ 17.

In that role, MAS manages the Medicaid Transportation Provider Network, receives transportation requests from Medicaid enrollees, verifies eligibility, assigns trips to providers, and monitors compliance with the New York State Medicaid Transportation Policy Manual (the "Manual"). Compl. ¶ 18. MAS also establishes compensation rates, requires providers to use its scheduling platform, and imposes timing requirements. *Id.* ¶¶ 19–22.

On January 3, 2024, MAS and AOT entered into a written Transportation Provider Network Contract (the "AOT Contract") governing MAS's assignment of trips to AOT and AOT's provision of non-emergency medical transportation ("NEMT") services. Compl. ¶ 26. MAS and Absolute 1 entered into a materially identical agreement on September 29, 2021 (the "Absolute 1 Contract") (collectively the "Provider Contracts"). *Id.* ¶ 27.

The Provider Contracts contain provisions governing trip assignments, provider performance, termination, corrective action, and appeals. Compl. ¶ 28. Among other things, the contracts require ninety days' written notice for termination without cause, thirty days' written notice and a ten-day opportunity to cure a material breach, permit immediate termination for certain defaults, and require compliance with the Manual. *Id.*

Plaintiffs allege that MAS's scheduling platform created conflicts that prevented providers from fulfilling their assigned trips. Compl. ¶¶ 32–38. Specifically, although providers could designate entire days as unavailable, they could not block off discrete periods within a day. Id. ¶ 32. MAS also imposed "strict timing requirements, including requirements that providers pick up enrollees within approximately fifteen (15) minutes of the scheduled time, creating safety and compliance pressure when assignments are unrealistic." *Id.* ¶ 22. MAS also allegedly assigned overlapping trips or trips that providers could not reasonably complete, forcing them either to decline or request reassignment of those trips or risk violating "the fifteen-minute pickup requirement, traffic laws, and/or passenger safety standards." *Id.* ¶¶ 33–35. MAS tracked those refusals and reassignment requests as "demerits" on internal scorecards and dashboards, which plaintiffs contend artificially inflated providers' "reassignment" or "refusal" rates. *Id.* ¶¶ 35–38.

Blazek alleges that he provided NEMT services through AOT and MAS's network from approximately 2021 through March 2025 and routinely worked over forty hours per week, including mornings, evenings, and weekends. Compl. ¶¶ 40–41. He further alleges that MAS exercised substantial control over his work through its trip assignments, scheduling platform, timing requirements, and ability to terminate his access to Medicaid transportation work. *Id.* ¶ 42. According to Blazek, he was economically dependent upon MAS for NEMT work but was nonetheless classified as an independent contractor and denied overtime compensation. *Id.* ¶¶ 43–44. Kendrick makes substantially similar allegations with respect to his work through Absolute 1. *Id.* ¶¶ 45–48.

Plaintiffs go on to allege that MAS relied on artificially inflated reassignment rates to terminate AOT and Absolute 1 from its provider network in March 2025. Compl. ¶¶ 49–66. Before AOT's termination, a MAS field liaison allegedly assured Blazek that reassignment rates were not punitive, prompting him to continue operating within MAS's network and purchase a second

vehicle for approximately $30,000. *Id.* ¶¶ 49–52. Nevertheless, on March 27, 2025, MAS notified Blazek and AOT that their participation in the network would terminate the following day, citing AOT's high reassignment rate. *Id.* ¶¶ 52–54. Similarly, on March 20, 2025, MAS notified Kendrick and Absolute 1 that their participation would terminate effective March 21, 2025, based on a substantially similar justification. *Id.* ¶¶ 60–61.

Plaintiffs allege that MAS failed to provide either company with the notice, opportunity to cure, corrective-action procedures, or meaningful appeal process required under the Provider Contracts. Compl. ¶¶ 55–58, 62–66. As a result, AOT and Absolute 1 allegedly lost ongoing transportation business, profits, and established customer relationships, diminishing the value of their businesses. *Id.* ¶¶ 59, 105, 110.

## III. LEGAL STANDARDS

### A. 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1) ). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (citations omitted). And "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Id.* (citations omitted).

### B. 12(b)(6)

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up). While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. DISCUSSION

Defendant has moved to dismiss the complaint on several grounds. The Court first addresses defendant's challenge to subject matter jurisdiction under CAFA, then considers whether plaintiffs have stated a claim under the FLSA. Finally, the Court addresses whether to exercise supplemental jurisdiction over plaintiffs' remaining state-law claims and whether leave to amend is warranted.

**A. Subject Matter Jurisdiction**

First, defendant argues that plaintiffs have not demonstrated the existence of subject matter jurisdiction. Def.'s Mem. at 13–16. Specifically, defendant contends that plaintiffs have not established diversity jurisdiction as to their NYLL and state-law contract claims. *Id.* at 14–16.[2] Plaintiffs respond that the complaint properly alleges jurisdiction under CAFA. Dkt. No. 18 ("Pls.' Opp.") at 33–36.

CAFA "gives federal courts jurisdiction over certain class actions, defined in [28 U.S.C.] § 1332(d)(1), if the class has more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84–85 (2014). Minimal diversity exists where "any member of a class of plaintiffs is a citizen of a State different from any defendant[.]" 28 U.S.C. § 1332(d)(2)(A).

Here, plaintiffs allege that "(a) the proposed Rule 23 class(es) number, upon information and belief, at least 100 members; (b) minimal diversity exists; and (c) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs." Compl. ¶ 7. Defendant argues that these allegations are insufficient because plaintiffs fail to identify any proposed class member whose citizenship differs from MAS's or provide a factual basis for their assertion that the amount in controversy exceeds $5 million. Def.'s Mem. at 14–15.

The Court agrees that plaintiffs have not adequately alleged minimal diversity. Although CAFA relaxes the traditional requirement of complete diversity, plaintiffs must still establish that at least one member of a proposed plaintiff class is a citizen of a different state than defendant. *See* 28 U.S.C. § 1332(d)(2)(A). The complaint, however, offers only the conclusory assertion that "minimal diversity exists." Compl. ¶ 7. It goes on to identify Blazek and Kendrick as New York

[2] Defendant also argues that plaintiffs' FLSA claims fail as a matter of law and, consequently, cannot serve as a basis for subject matter jurisdiction. This argument will be discussed *infra*.

residents, AOT and Absolute 1 as New York limited liability companies, and MAS as a New York limited liability company with its principal place of business in New York. *Id.* ¶¶ 12–16. Plaintiffs do not identify any proposed class member domiciled or organized outside New York.[3]

Plaintiffs respond that CAFA requires only *one* member of a proposed class to be a citizen of a different state and that defendant has not demonstrated that every single proposed class member is a New York citizen. Pls.' Opp. at 33–35. But this argument misstates plaintiffs' own burden. It is plaintiffs, as the parties invoking CAFA jurisdiction, who must establish a factual basis for minimal diversity. *See Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57–59 (2d Cir. 2006) (noting that "[i]t is well-settled that the party asserting federal jurisdiction bears the burden of establishing jurisdiction" and holding that CAFA does not alter this rule).

Defendant's inability to definitively establish the citizenship of every proposed class member does not relieve plaintiffs of their burden. "Allegations like these do not meet the plausibility standard for substantive allegations under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and there is no reason why jurisdictional allegations – the fundamental building blocks on which the power of the federal courts rests – should be treated more casually." *Kenshoo, Inc. v. Aragon Advertising, LLC*, 586 F. Supp. 3d 177, 180 (E.D.N.Y. 2022) (cleaned up).

Defendant further argues that plaintiffs have not adequately established the requisite amount in controversy. Beyond alleging that the aggregate amount in controversy exceeds $5 million, Compl. ¶ 7, plaintiffs offer no estimate of the number of affected transportation providers

---

[3] While the citizenship of a limited liability company ordinarily depends upon the citizenship of its members, CAFA provides that an "unincorporated association" is a citizen of "the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10). The Second Circuit has not definitively resolved whether this provision encompasses limited liability companies. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016). The Court need not resolve that question because plaintiffs have not adequately alleged facts establishing minimal diversity under either approach.

or drivers, their alleged unpaid wages, the value of the terminated provider contracts, or the damages attributable to defendant's challenged conduct. Although the complaint alleges that AOT and Absolute 1 suffered lost profits, lost business opportunities, and diminished business value, *id.* ¶¶ 59, 105, 110, plaintiffs do not so much as attempt to quantify those losses.

In opposition, plaintiffs argue that their allegations of unpaid wages, liquidated damages, lost profits, and diminished business value plausibly establish an amount in controversy exceeding $5 million. Pls.' Opp. at 34. To be sure—and as plaintiffs point out—"the statute tells the District Court to determine whether it has jurisdiction by adding up the value of the claim of each person who falls within the definition of [a plaintiff's] proposed class and determine whether the resulting sum exceeds $5 million." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013). However, identifying categories of recoverable damages does not, without more, permit the Court to find a "'reasonable probability' that the aggregate claims of the plaintiff class are in excess of $5 million." *Blockbuster*, 472 F.3d at 58.

Defendant alternatively argues that, even if plaintiffs have adequately alleged CAFA jurisdiction, the Court should nonetheless decline to exercise jurisdiction under CAFA's "home state" exception. Def.'s Mem. at 15–16. That exception requires district courts to decline jurisdiction where "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B). Although the exception does not deprive a court of subject-matter jurisdiction, it operates as a mandatory abstention provision requiring the court to decline to exercise otherwise valid CAFA jurisdiction when its requirements are satisfied. *See Gold v. N.Y. Life Ins.*

*Co.*, 730 F.3d 137, 141–42 (2d Cir. 2013). The party invoking the exception bears the burden of establishing its applicability. *Id.* at 142.

In support of this position, defendant submits a declaration from Brian Renna stating that approximately 97.5 percent of the drivers participating in MAS's transportation provider network possess New York state driver's licenses. *See* Def.'s Mem. at 15; Dkt. No. 16-1 ("Renna Decl.") ¶ 7. Defendant contends that this evidence establishes that more than two-thirds of the proposed class members are New York citizens. Def.'s Mem. at 15. Plaintiffs respond that possession of a New York driver's license does not necessarily establish citizenship and that defendant's evidence does not account for the citizenship of the transportation provider entities comprising the proposed Provider Contract and Termination Class. Pls.' Opp. at 34–35.

The Court need not resolve that dispute. Because plaintiffs have not established the statutory prerequisites for CAFA jurisdiction in the first place, the Court need not determine whether the home state exception independently requires it to decline jurisdiction. Accordingly, plaintiffs have failed to establish CAFA as an independent basis for subject matter jurisdiction over their proposed Rule 23 class claims.

But the analysis does not end with that conclusion. Plaintiffs also assert a claim under the FLSA, which independently invokes the Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331. *See Bell v. Hood*, 327 U.S. 678, 682–83 (1946) (explaining that a federal court's jurisdiction is not defeated merely because a complaint fails to state a claim upon which relief may be granted). Whether plaintiffs have adequately pleaded their FLSA claim is therefore a question concerning the claim's merits. *See Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 701 (2d Cir. 2000) ("[P]laintiff's failure to state a federal claim upon which relief could be granted

does not mean that federal question jurisdiction is lacking."). The Court accordingly turns to defendant's argument that plaintiffs have failed to state a claim under the FLSA.

**B. Plaintiffs' FLSA Claims**

Defendant next argues that plaintiffs have failed to state a claim under the FLSA. Def.'s Mem. at 16–30. Specifically, defendant argues that neither Blazek nor Kendrick has plausibly alleged that MAS was their "employer" within the meaning of the FLSA or that they were denied minimum wage or overtime compensation during any specific workweek. *Id.* Plaintiffs respond that MAS exercised enough control over their working conditions to qualify as a joint employer and that their allegations concerning unpaid overtime are sufficient to survive dismissal. Pls.' Opp. at 12–18.

**1. Joint Employer Tests**

"[T]he FLSA requires employers to pay overtime to covered employees who work more than 40 hours in a week." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 81 (2018) (citing 29 U.S.C. § 207(a)). "To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (citations omitted).

The FLSA defines an "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and defines "employ" to include "to suffer or permit to work," *id.* § 203(g). These definitions are broad, reflecting the FLSA's remedial purpose. *See, e.g.*, 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time."). As the Second Circuit has explained, "[i]f the employer suffers or permits the work—either by requiring it, knowing about it, or failing to exercise reasonable diligence to discover it—then it must compensate the employee,

even if the employee failed to report the work and even if the employer did not know that the employee was working unpaid." *Perry v. City of N.Y.*, 78 F.4th 502, 509 (2d Cir. 2023).

An employee may have multiple employers that may be held jointly and severally liable for wages owed to an employee. *See Sanchez v. E.I.G. Auto Salvage, Inc.*, 2023 WL 5827669, at *17 (S.D.N.Y. Sept. 8, 2023). Courts assess joint employment by "economic reality rather than technical concepts." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (citing *Goldberg v. Whitaker House Corp., Inc.*, 366 U.S. 28, 33 (1961)).

Courts in the Second Circuit assess whether a joint employment relationship exists by examining the degree of both "formal control" and "functional control" exercised by the putative employer. First, the "formal control" approach considers four factors:

> "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."

*Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984). Second, the "functional control" approach asks courts to consider six factors:

> (1) whether [the alleged employer's] premises and equipment were used for the plaintiffs' work; (2) whether the [plaintiffs' employer] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the alleged employer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [the alleged employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [the alleged employer].

*Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 72 (2d Cir. 2003).

Importantly, the "formal" and "functional" control tests from *Carter* and *Zheng* do not "comprise a rigid rule for the identification of an FLSA employer." *Irizarry v. Catsimatidis*, 722 F.3d 99, 105 (2d Cir. 2013) (citation omitted). Rather, "they provide a nonexclusive and

overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Id.* (cleaned up).

Defendant argues that neither the *Carter* nor the *Zheng* factors support a finding that MAS was Blazek or Kendrick's joint employer. Def.'s Mem. at 18–28. According to defendant, the complaint describes MAS's contractual relationship with AOT and Absolute 1, rather than an employment relationship with Blazek and Kendrick individually. *Id.* Defendant further contends that the control that it allegedly exercised over trip assignments, scheduling, and provider performance was consistent with its obligations as New York State's designated NEMT broker. *Id.* Plaintiffs respond that MAS controlled nearly every aspect of their working conditions, including their access to Medicaid riders, trip assignments, scheduling requirements, compensation opportunities, and continued participation in the transportation network, and that these allegations sufficiently establish MAS's status as a joint employer. Pls.' Opp. at 12–16.

Turning first to the formal control test, plaintiffs' allegations do not establish that MAS exercised formal control over Blazek or Kendrick under *Carter*. As to the first factor, plaintiffs do not allege that MAS possessed authority to hire or fire either Blazek or Kendrick. Although MAS allegedly terminated AOT's and Absolute 1's participation in its transportation network, Compl. ¶¶ 53–62, the authority to terminate a contract with a transportation provider is not the same as the authority to hire or discharge that provider's employees. Indeed, Blazek and Kendrick themselves owned and operated their respective transportation companies. *Id.* ¶¶ 12–15. The

complaint does not allege that MAS could direct either company to hire or discharge a particular driver.

The second factor—whether the purported joint employer supervises and controls employee work schedules or conditions of employment—presents a closer question. Plaintiffs allege that MAS exercised "exclusive control over trip assignments and access to Medicaid riders," required use of its scheduling platform, imposed "strict timing requirements," and possessed "the practical ability to terminate access to all Medicaid transportation work on one day's notice." Compl. ¶¶ 42, 47. Plaintiffs further allege that MAS's scheduling platform overbooked providers and generated overlapping trip assignments, effectively forcing providers to choose between "refus[ing] or request[ing] reassignment of trips that were unsafe, unlawful, or impossible to perform on time" or "attempt[ing] to perform all assigned trips and risk[ing] violating the fifteen-minute pickup requirement, traffic laws, and/or passenger safety standards." *Id.* ¶¶ 32–38.

These allegations demonstrate that MAS exercised substantial control over the manner in which transportation services were coordinated and assigned. They do not, however, plausibly establish that MAS supervised Blazek or Kendrick in their individual capacities as drivers. "Simply determining when a certain job will be performed is not tantamount to determining which employee will perform that job at a particular time." *Godlewska v. HDA*, 916 F. Supp. 2d 246, 260 (E.D.N.Y. 2013). The complaint does not allege that MAS determined which drivers AOT or Absolute 1 assigned to particular trips, dictated the number of hours either plaintiff worked, or otherwise "control[led]" their "day-to-day conditions of employment." *Id.* (quoting *Lepkowski v.*

*Telatron Marketing Grp., Inc.*, 766 F. Supp. 2d 572, 579 (W.D. Pa. 2011)). Rather, the challenged requirements applied generally to transportation providers participating in MAS's network.

Moreover, MAS's oversight must be considered against the backdrop of its responsibilities as New York State's designated NEMT broker. Under federal and New York law, MAS is responsible for coordinating transportation services, monitoring provider performance, and ensuring timely access to medically necessary transportation. *See* 42 CFR § 440.170(a)(4); N.Y. Soc. Serv. Law § 365-h(4)(b). Requirements concerning scheduling, timeliness, and performance are therefore consistent with MAS's regulatory responsibilities. As courts have recognized, supervision intended to ensure compliance with contractual standards or regulatory requirements does not necessarily constitute the sort of control contemplated by this factor. *See Godlewska*, 916 F. Supp. 2d at 259 ("Exercising quality control by having strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions . . . [t]his is especially true where the quality control's purpose is to ensure compliance with the law"); *see also Hugee v. SJC Grp., Inc.*, 2013 WL 4399226, at *6 (S.D.N.Y. Aug. 14, 2013) (granting motion to dismiss and explaining that "[t]aking measures to ensure quality control does not prove control over the conditions of employment") (citation omitted).

Third, plaintiffs do not plausibly allege that MAS determined either Blazek or Kendrick's rate and method of payment. Although the complaint alleges that MAS "unilaterally" set trip compensation rates and that participating providers possessed little ability to negotiate those rates, Compl. ¶ 20, it does not allege that MAS determined the wages that AOT paid Blazek or that Absolute 1 paid Kendrick. Nor does the complaint allege that MAS paid either individual directly. "When making the determination of whether a purported joint employer determined a plaintiff's rate and method of payment, 'the key question is whether [the employer] had the authority to sign

paychecks throughout the relevant [employment] period.'" *Hugee*, 2013 WL 4399226, at *7 (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 140 (2d Cir. 1999)). Accordingly, the third *Carter* factor weighs against finding that MAS was a joint employer.

Finally, plaintiffs do not allege that MAS maintained their employment records. Although MAS tracked trip assignments and provider performance through its scheduling platform, Compl. ¶¶ 21, 35–38, the complaint does not allege that MAS maintained "personnel files, time sheets, pay stubs, and government employment forms." *Hugee*, 2013 WL 4399226, at *7. Accordingly, the fourth *Carter* factor likewise weighs against finding joint employment.

Taken together, the *Carter* factors do not plausibly suggest that MAS exercised formal control over Blazek or Kendrick. However, "in certain circumstances, an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them." *Zheng*, 355 F.3d at 70. Accordingly, the Court next considers whether plaintiffs have plausibly alleged that MAS exercised functional control over their work under *Zheng*.

The first *Zheng* factor asks "whether [the putative joint employer]'s premises and equipment were used for the plaintiffs' work[.]" 355 F.3d at 72. This factor "is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." *Id.* Nevertheless, "shared premises" are not "anything close to a perfect proxy for joint employment (because they are . . . perfectly consistent with a legitimate subcontracting relationship)." *Id.*

Here, plaintiffs' complaint does not allege that Blazek or Kendrick used MAS's premises or equipment. To the contrary, Blazek alleges that he personally purchased an additional vehicle to expand AOT's operations. Compl. ¶ 51. Although plaintiffs allege that MAS required

transportation providers to use its scheduling platform, *id.* ¶¶ 21, 42, 47, they do not allege that MAS furnished the vehicles or other equipment used to transport Medicaid enrollees. Accordingly, although mandatory use of MAS's platform lends some support to plaintiffs' position, the first factor weighs against finding functional control.

The second *Zheng* factor considers "whether the [employers] had a business that could or did shift as a unit from one putative joint employer to another[.]" 355 F.3d at 72. This factor "is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." *Id.* Importantly, this factor does not require that a contractor actually have shifted its business to another putative joint employer; rather, it is sufficient that the contractor *could* have done so. *See Jean–Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 132 (S.D.N.Y. 2011).

Here, plaintiffs allege that MAS exercised exclusive control over access to Medicaid riders and that Blazek and Kendrick were economically dependent upon MAS for NEMT work. *See* Compl. ¶¶ 19, 42–43. These allegations suggest that AOT and Absolute 1 may have faced practical limitations on their ability to obtain Medicaid transportation assignments independently of MAS. Still, plaintiffs do not allege that either company was prohibited from providing other transportation services or that its business was otherwise incapable of operating independently of MAS's network. *See Godlewska*, 916 F. Supp. 2d at 263 (explaining that the alleged joint employers' exclusive access to Medicaid recipients did not preclude transportation providers from serving other customers).

The *Zheng* inquiry is not intended to "bring normal, strategically-oriented contracting schemes within the ambit of the FLSA." *Zheng*, 355 F.3d at 76. Accordingly, while plaintiffs' alleged economic dependence on MAS lends some support to their position, the complaint does

not contain sufficient facts to support a reasonable inference that AOT or Absolute 1 was functionally integrated into MAS's operations rather than operating as an independent transportation business. The second factor therefore provides little support for finding functional control.

The third factor examines "the extent to which plaintiffs performed a discrete line-job that was integral to [the putative joint employer's] process of production[.]" *Zheng*, 355 F.3d at 72. This factor differentiates "piecework on a producer's premises that requires minimal training or equipment[ ] and which constitutes an essential step in the producer's integrated manufacturing process" from "work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology." *Id.* at 73.

Here, Blazek and Kendrick provided transportation services to Medicaid enrollees through their respective companies. Compl. ¶¶ 40, 45. Although those services were integral to the Medicaid transportation program administered by MAS, MAS itself operated as a transportation broker rather than a transportation provider. Indeed, federal and state law generally prohibit NEMT brokers from directly furnishing transportation services. *See* 42 C.F.R. § 440.170(a)(4)(ii)(A); N.Y. Soc. Serv. Law § 365-h(4)(b)(i)(D). Further, this factor "might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product." *Jean–Louis,* 838 F. Supp. 2d at 134. Accordingly, the third *Zheng* factor provides little support for a finding of joint employment.

The fourth factor asks "whether responsibility under the contracts could pass from one subcontractor to another without material changes[.]" *Zheng*, 355 F.3d at 72. This inquiry concerns whether the workers are effectively tied to the putative joint employer's business, such that the "same employees would continue to do the same work in the same place" in the event of a change in subcontractors. *Id.* at 74. Here, plaintiffs do not allege that Blazek or Kendrick would

have continued providing NEMT services through MAS had AOT or Absolute 1 ceased participating in the provider network. In fact, the complaint alleges that their access to Medicaid transportation work *did* end when MAS terminated the Provider Contracts. Compl. ¶¶ 53–62. Nevertheless, the fact that Blazek and Kendrick ceased performing work through MAS upon the termination of their companies' contracts does not necessarily establish whether their responsibilities could have been transferred to another provider without material change. Accordingly, the fourth factor is neutral.

The fifth factor examines "the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work[.]" *Zheng*, 355 F.3d at 72. As discussed above, plaintiffs allege that MAS controlled trip assignments, imposed timing requirements, monitored reassignment rates, and possessed authority to terminate transportation providers from its network. However, the complaint does not allege that MAS supervised Blazek or Kendrick in their individual capacities as drivers, determined which drivers would perform particular trips, or directed the manner in which they performed their daily duties.

Instead, MAS's alleged oversight concerned the coordination and quality of transportation services provided through its network. Such oversight is consistent with a legitimate contractual relationship and does not, without more, establish functional control over individual workers. *See Zheng*, 355 F.3d at 75 (distinguishing supervision "with respect to contractual warranties of quality and time of delivery" from supervision "demonstrat[ing] effective control of the terms and conditions of [a worker's] employment"). Accordingly, the fifth factor weighs against finding that MAS jointly employed Blazek or Kendrick.

Finally, the sixth factor considers "whether plaintiffs worked exclusively or predominantly for the [putative joint employer]." *Zheng*, 355 F.3d at 72. This factor is relevant because, "in

cases in which the purported joint employees worked exclusively or predominantly for the purported joint employer . . . the joint employer may *de facto* become responsible, among other things, for the amount workers are paid and for their schedules, which are traditional indicia of employment." *Id.* at 75 (citations omitted). Blazek and Kendrick allege that they performed NEMT services as their primary occupation and were economically dependent upon MAS for access to Medicaid riders. *See* Compl. ¶¶ 41, 43, 46. Accepting those allegations as true, the Court finds that this factor weighs in favor of plaintiffs.

Considering the *Zheng* factors together, the Court concludes that plaintiffs have failed to plausibly allege that MAS exercised functional control over Blazek or Kendrick sufficient to establish a joint employment relationship. "To reach this conclusion, the Court need not decide that *every* factor weighs against joint employment." *Zheng*, 355 F.3d at 76–77 (emphasis in original). Although MAS allegedly exercised substantial control over access to Medicaid transportation assignments and the performance standards applicable to participating providers, the complaint does not adequately distinguish that authority from the control ordinarily exercised by an entity administering a network of independent contractors. Plaintiffs' allegations principally concern MAS's contractual relationships with AOT and Absolute 1, rather than its supervision or employment of Blazek and Kendrick themselves. *See Godlewska*, 916 F. Supp. 2d at 265 ("[O]n balance, [purported joint employer] did not exercise functional control over plaintiffs."); *Jean–Louis*, 838 F. Supp. 2d at 136 (holding that purported joint employer did not jointly employ plaintiffs where "almost every factor weighs against finding" joint employment).

To be sure, the determination of joint employer status is fact-intensive, and the absence of formal control does not necessarily preclude liability under the FLSA. *See Zheng*, 355 F.3d at 69–72. Nevertheless, even accepting plaintiffs' allegations as true and drawing all reasonable

inferences in their favor, the complaint does not plausibly establish that MAS exercised either formal or functional control over Blazek or Kendrick. *See Hugee*, 2013 WL 4399226, at *4 (quoting *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 692 (D. Md. 2010)) ("In considering these factors, a court need not decide that every one of them weighs against joint employment . . . the question of joint employment turns on the entire relationship, 'viewed in its totality'"). Accordingly, plaintiffs have failed to state a claim under the FLSA.

**2. Wage and Hour Violations**

Even assuming that plaintiffs had plausibly alleged that MAS was their joint employer, defendant argues that Count I must nevertheless be dismissed because Blazek and Kendrick have not plausibly alleged that they were "paid below minimum wage or that they performed work that caused them to earn unpaid overtime in any specific workweek." *See* Def.'s Mem. at 29–30. The Court agrees.

The FLSA requires covered employers to pay employees a minimum hourly wage of $7.25 and overtime compensation at a rate of at least one and one-half times their regular rate for hours worked in excess of forty per workweek. *See* 29 U.S.C. §§ 206(a)(1)(C), 207(a)(1). "Therefore, to state a FLSA minimum wage claim, [a plaintiff] must prove that, in a given week, the total amount he was paid divided by the number of hours he worked was less than $7.25 per hour." *Fangrui v. GW of Flushing I, Inc.*, 2019 WL 145528, at *5 (E.D.N.Y. Jan. 9, 2019).

Similarly, "[t]o plead a plausible FLSA overtime claim, plaintiffs must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013). A plaintiff must "sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *Lundy v.*

*Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013). Although plaintiffs need not "plead their hours with mathematical precision," they must provide sufficient factual allegations to render their claims plausible. *DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 90 (2d Cir. 2013). "[T]he FLSA is unavailing where wages do not fall below the statutory minimum and hours do not rise above the overtime threshold." *Nakahata*, 723 F.3d at 201 (citing *Lundy*, 711 F.3d at 115)).

The Second Circuit has clarified that a plaintiff need not identify a particular calendar week in which he worked uncompensated overtime if he plausibly alleges that his regularly scheduled workweek exceeded forty hours during an identifiable period of employment. *See Herrera v. Comme des Garçons, Ltd.*, 84 F.4th 110, 116–17 (2d Cir. 2023). "This pleading standard is unmet if all that plaintiffs allege is that at some undefined period in their employment they worked more than forty hours in a single week," since "[s]uch an allegation would be far too vague and unhelpful for putting a defendant on notice of the alleged violation." *Id.* (emphasis in original). On the other hand, "[t]he pleading standard is satisfied . . . if plaintiffs allege that their regularly scheduled workweek for a given period of time included more than forty hours of work, so that they were eligible for overtime during every week in which they worked their regular schedule." *Id.* at 117.

Here, plaintiffs' minimum wage allegations plainly fall short.[4] Count I seeks unpaid minimum wages "[t]o the extent applicable," Compl. ¶ 91, but the complaint contains no allegations concerning the wages Blazek or Kendrick actually received or the number of hours they worked. Nor does it otherwise allege facts suggesting that either plaintiff received less than $7.25 per hour

[4] Defendant further argues that plaintiffs abandoned their minimum wage claim by failing to address it in their opposition. Dkt. No. 21 ("Def.'s Reply") at 10. Although plaintiffs devote the bulk of their argument to their overtime allegations, they do not expressly abandon their minimum wage theory. *See* Pls.' Opp. at 16–18. In any event, the Court need not resolve whether plaintiffs abandoned that claim because the complaint fails to plausibly allege that either Blazek or Kendrick received compensation below the statutory minimum during any workweek.

during any workweek. Without such factual allegations, the Court cannot reasonably infer that either plaintiff was compensated below the statutory minimum. Accordingly, plaintiffs have failed to state a minimum wage claim under the FLSA.

Plaintiffs' overtime allegations fare no better. The complaint alleges that Blazek and Kendrick "regularly worked more than forty (40) hours per week while providing NEMT services through MAS's network" and that MAS failed to pay overtime for those hours. Compl. ¶¶ 89–90. But plaintiffs provide no "factual context or content" for those claims. *DeJesus*, 726 F.3d at 89. Elsewhere in the complaint, plaintiffs allege that they "routinely worked well over forty" hours per week, "including early mornings, evenings, and weekends[.]" *Id.* ¶¶ 40–48.

However, the complaint does not estimate either individual plaintiff's typical weekly hours, identify the approximate duration or frequency of their shifts, or otherwise describe their schedules in sufficient detail to support a reasonable inference that they performed uncompensated overtime work during a given workweek. *See Lennert v. Delta-Sonic Carwash Systems, Inc.*, 2022 WL 18859077, at *4 (W.D.N.Y. Nov. 1, 2022) (quoting *Henao v. Parts Auth., LLC*, 2020 WL 5751175, at *3 (S.D.N.Y. Sept. 25, 2020)) ("A plaintiff does not state a claim for unpaid FLSA overtime when she does 'not estimate her hours in any or all weeks or provide any other factual context or content,' but instead alleges only that 'she worked more than "forty hours" a week without being paid "1.5" times her rate of compensation,' as such pleadings merely 'rephrase' FLSA § 207(a)(1)."); *Romero v. Metro. Transp. Auth.*, 444 F. Supp. 3d 583, 587 (S.D.N.Y. 2020) (holding

that when a plaintiff's overtime allegations are " 'devoid of any numbers to consider beyond those plucked from the statute,'" they are "insufficient to state a claim") (citation omitted).

Accordingly, even assuming that MAS qualified as plaintiffs' joint employer, Blazek and Kendrick have failed to plausibly allege violations of the FLSA's minimum wage or overtime requirements. Count I is therefore dismissed for this independent reason.

**C. Plaintiffs' State-Law Claims**

Having concluded that plaintiffs have failed to state a claim under the FLSA, the Court next considers whether to exercise supplemental jurisdiction over their remaining state-law claims. Defendant argues that, in the absence of a viable federal claim or an independent basis for diversity jurisdiction under CAFA, the Court should decline to exercise supplemental jurisdiction over Counts II through VI. *See* Def.'s Mem. at 30–33. Plaintiffs respond that their state-law claims arise from the same nucleus of operative facts as their FLSA claim and that the Court should exercise supplemental jurisdiction. *See* Pls.' Opp. at 30–33.

Under 28 U.S.C. § 1367(a), federal district courts may exercise supplemental jurisdiction over state-law claims that "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Claims form part of the same case or controversy when they "derive from a common nucleus of operative fact." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (quoting *Cicio v. Does*, 321 F.3d 83, 97 (2d Cir. 2003)).

Nevertheless, a district court "may decline to exercise supplemental jurisdiction over a claim" once it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "It is well settled that where, as here, [plaintiffs'] federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over

remaining state law claims." *Klein & Co. Futures v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006). This is because "our circuit takes a very strong position that state issues should be decided by state courts." *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir. 2017) (Calabresi, J., concurring).

Here, the Court has dismissed plaintiffs' sole federal claim and determined that plaintiffs have not adequately established CAFA jurisdiction over their proposed Rule 23 class claims. Moreover, "[t]his case is still in its early stages . . . no dispositive motions, other than the present one, have been briefed." *Henao*, 2020 WL 5751175, at *7. Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state-law claims, which are dismissed without prejudice to plaintiffs' ability to reassert them in an amended complaint or pursue them in an appropriate state forum.

**D. Leave to Amend**

Finally, plaintiffs request leave to amend their complaint in the event the Court concludes that any of their claims are inadequately pleaded. *See* Pls.' Opp. at 36–37. Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). A court may deny leave to amend "for good reason, including futility, bad faith, undue

delay, or undue prejudice to the opposing party." *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009).

Here, plaintiffs have not previously amended their complaint, and the Court cannot conclude that amendment would necessarily be futile. Accordingly, the Court will afford plaintiffs an opportunity to file an amended complaint.

## V. CONCLUSION

Therefore, it is

ORDERED that

1. Defendant's motion to dismiss (Dkt. No. 16) is **GRANTED**;

2. Plaintiffs' claim under the Fair Labor Standards Act (Count I) is **DISMISSED** without prejudice for failure to state a claim;

3. The Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims (Counts II–VI), which are **DISMISSED** without prejudice;

4. Plaintiffs are granted leave to file an amended complaint within thirty (30) days of the date of this Decision and Order;

5.. If plaintiffs do not timely file an amended complaint, the Clerk of the Court is directed to enter a judgment dismissing this action without further Order of the Court.

The Clerk of the Court is directed to terminate the pending motion and set a deadline accordingly.

**IT IS SO ORDERED.**

Dated: November 19, 2026
Utica, New York.

Anthony J. Brindisi
U.S. District Judge